OPINION OF THE COURT
Joseph G. Makowski, J.
The Parties
Petitioner-plaintiff, the Western New York District, Inc. of the Wesleyan Church (hereinafter referred to as District), is a corporation organized and existing under the Religious Corporations Law. The Vine Wesleyan Church (hereinafter referred to as Church) is a nonincorporated association of persons that operates under the authority of the District. The District and Church, for the purposes of this special proceeding, are united in interest and are sometimes hereinafter referred to as petitioners. In substance, petitioners constitute a church with a congregation of approximately 200 persons.
The Village of Lancaster is a municipal corporation organized and existing under the laws of the State of New York with a municipal office located at 5423 Broadway Avenue, Lancaster, New York. The Village of Lancaster Board of Trustees (hereinafter referred to as the Village Board) is a municipal board organized and existing under the laws of the State of New York with a municipal office located at 5423 Broadway Avenue, Lancaster, New York.
Respondent, Jeffrey H. Simme, is employed by the Town of Lancaster, but also serves as the village code enforcement officer pursuant to an agreement between the Town of Lancaster and the Village. In his capacity as code enforcement officer, Mr. Simme is responsible for determinations regarding the Village of Lancaster Zoning Board. The Village of Lancaster Community Development Corporation (hereinafter referred to as the Village CDC) is a public benefit corporation organized and existing under the laws of the State of New York.
Procedural Background
On or about February 27, 2007, petitioners entered into an agreement to purchase a building owned by Sherex Industries, Inc. at 1400 Commerce Parkway and zoned as an industrial park located in the Village. {See affidavit of Reverend Christo *800 pher Baldwin, dated May 3, 2007.) In relevant part, petitioners’ purchase agreement for the subject property recites:
“Contingencies: Check and initial those applicable . . .
“X (d) Offer is subject [to] Village of Lancaster issuing a Special Use Permit to use the property as a church. Said permit to be received within sixty (60) days of the acceptance of this offer. . . .
“Zoning: By accepting this Offer Seller represents that to the best of Seller’s knowledge, the Property is currently zoned as MIE”
On or about March 12, 2007, respondent, Jeffrey H. Simme, in a written communication, advised Reverend Christopher Baldwin that it was necessary for the Church to secure a zoning use variance obtained from the Zoning Board of Appeals if petitioners desired to use the structure at 1400 Commerce Parkway as a church. On March 23, 2007, Jeffrey J. Stribing, president of the Village CDC, wrote Reverend Baldwin to advise him that petitioners’ application for utilization of 1400 Commerce Parkway as a church was being denied due to the fact that the property was located in the Village Industrial Park which was not zoned for use as a church. (Affidavit of Baldwin, exhibit D.) Thereafter, petitioners sought review before the Village of Lancaster Zoning Board of Appeals. Petitioners subsequently terminated the Village Board review and filed a special proceeding before this court requesting declaratory and related relief, as more specifically recited in the petition.
On May 4, 2007, petitioners secured an order to show cause in connection with this matter. Thereafter, respondents filed a verified answer and motion to dismiss. On June 8, 2007, this court issued a 32-page bench decision which in substance directed petitioners to seek a special use permit from respondents consistent with the requirements of Village of Lancaster Code (Zoning Ordinance) § 152-70. (Affidavit of Sean Hopkins, Esq., dated Apr. 7, 2007, exhibit B.) In relevant part, the court held:
“The Court determines that petitioners must seek a special use permit from the respondents consistent with the requirements of Village Code Section 152-70. . ..
“Petitioners’s special permit application must be evaluated by respondents consistent with the requirements of New York case law which addresses *801 application by a church to utilize the subject property for religious purposes. Specifically, I refer respondents to Pine Knolls and Cornell University. That being said, The Court is extremely cognizant of the fact that New York case law is not fully developed on the question of a church being able to be located in either a commercial district or in an industrial park . . . .”
On July 2, 2007, petitioners submitted a special use permit application to the Village of Lancaster Planning Commission. (Amended petition/verified complaint, exhibit E.) The Village immediately referred the application to the Village Planning Commission for review and recommendations to the Village Board pursuant to section 152-70 of the Zoning Ordinance. On July 19, 2007, the Planning Commission, after receiving comments in support of and in opposition to the application and reviewing relevant documentary material, by a six to one vote, issued a resolution recommending denial of the special use permit.
The Village then scheduled a public hearing on the application for July 23, 2007, the date of the next meeting of the Village Board. At the public hearing, petitioners’ representatives, as well as those of the Village CDC and citizens, presented testimony and documentary evidence both for and against the application. Due to the complexity of the materials, and issues to be resolved, the Village Board deferred decision until its next regular meeting, scheduled for August 13, 2007.
On July 30, 2007, the Village Board conducted a special meeting to address petitioners’ application for a special use permit. At the July 30, 2007 special meeting, the Board, by a unanimous seven to zero vote, adopted a resolution denying the Church’s application for a special use permit for conversion of the Sherex property at 1400 Commerce Parkway for religious use. On August 7, 2007, petitioners served an order to show cause and amended petition and supporting papers challenging the Village Board’s denial of the special use permit. On August 13, 2007, respondents filed a verified answer in this special proceeding requesting dismissal of the proceeding. The matter was returnable on August 17, 2007 at special term. Following oral argument, the court reserved decision.
Statement of Facts
On February 27, 2007, the Church and its parent organization entered into a contract to purchase a parcel of land and *802 industrial building owned by Sherex Industries, Inc. in the Village Industrial Park. The contract was expressly subject to the issuance by the Village of a special use permit allowing use of the property as a church.
In relevant part, the Village Zoning Ordinance (Village Code ch 152) permits churches of right anywhere in a village residential, commercial or manufacturing district. (Village Code § 152-25.) However, Village Code § 152-26, addressing Industrial Park zoning, unconditionally restricts land to industrial and related uses. (See Baldwin affidavit, dated May 20, 2007, exhibit C.)
The Village CDC is owner of the real property in the Village designated as the Village of Lancaster Industrial Corridor (hereinafter referred to as Industrial Park). On September 1, 2000, the Village CDC filed, in the Office of the Erie County Clerk, a Declaration of Building and Site Standards. (Baldwin affidavit, exhibit E.) In relevant part, the Declaration recites:
“Village of Lancaster Community Development Corporation (LCDC) is the owner of certain real property in the Village of Lancaster, Erie County, State of New York, described in Exhibit ‘A’ and herein designated as the ‘Village of Lancaster Industrial Corridor’ or the ‘Park’. This Declaration sets forth various building and site standards, use restrictions and other provisions which, upon the recording of this Declaration with the clerk of the County of Erie, shall be imposed upon the Park and any and all subdivisions thereof and which shall bind and run with the land until this Declaration shall terminate in accordance with its terms.
“ARTICLE I — PURPOSE
“In order to establish a general plan for the improvement and development of the Park, LCDC herein imposes on the Park the Declaration and all of the provisions and restrictions set forth herein. . . .
“ARTICLE III — USE
“A. Properties within the Park shall be used only for purposes as are permitted by the M-IP District of the Village of Lancaster Zoning ordinance as amended from time to time and which are not otherwise prohibited by this Declaration. . . .
“ARTICLE XI — JOB CREATION REQUIREMENTS
“The Village of Lancaster shall require the Local *803 Development Corporation or developer or other owners of industrial part properties improved with these funds to place the following deed restrictions upon any parcels in the industrial park before sale or transfer:
“ ‘This parcel has been developed with the assistance of funding from the Erie County community Development Block Grant Program and is conditioned by eligibility requirements of the US Department of Housing and Urban Development.
“The use of these funds for economic development purposes requires the creation of jobs, 50% of which will be held or made available to low and moderate income persons. The limits of low and moderate income on a household size basis are defined by H.U.D. in the table, which is attached to this Agreement and incorporated herein as Exhibit 1’. . .
“ARTICLE XIII — TERM
“A. This Declaration and the covenants and restrictions herein contained shall be binding upon and run with the park properties until December 31, 2012 at which time this Declaration shall expire. . . .
‘ARTICLE XV — JOB CREATION REQUIREMENTS
“The Village of Lancaster shall require the Local Development Corporation or developer or other owners of industrial park properties improved with these funds to place the following deed restrictions upon any parcels in the industrial park before sale or transfer.”
The Declaration and related documents were filed with the Erie County Clerk on September 1, 2000 (deed liber book 10971 at 0327). (Baldwin affidavit, exhibit E.)
The Village Industrial Park was created consistent with the Town of Lancaster, Village of Lancaster, and Village of Depew Comprehensive Plan adopted by the Village Board on February 14, 2000 and enacted on November 1, 2000. (See, Town of Lancaster, Village of Lancaster, Village of Depew: A Comprehensive Plan, A Common Future, § 5.0, Economy and Growth, at 285-308 [hereinafter referred to as the Comprehensive Plan].) Section 5.4.1 of the Comprehensive Plan recites:
“5.4.1 Industrial Development. . .
“Walden Avenue bounded by Dick and Town Line *804 Roads is currently an industrial-based corridor that is home to many of the most significant industries in the Lancaster/Depew region. Existing businesses include Aim Corrugated Box, American Sales Company, . . . and Lancaster Steel Services, to name just a few. This ‘critical mass’ of industries, in conjunction with strategic location and convenient transportation, can serve as a catalyst for future industrial development opportunities within the region. . . .
“This land area is home to several existing industries and has potential for future expansion.”
By order to show cause granted May 4, 2007, the Church commenced a hybrid CPLR article 78-declaratory judgment proceeding challenging the exclusion of churches from the Industrial Park. On June 8, this court rendered a bench decision requiring the Church to apply for a special permit in accordance with Zoning Ordinance § 152-70. In its ruling, the court imposed upon village authorities the obligation to consider and determine petitioners’ special use application in accordance with the balancing approach adopted by the Court of Appeals in Cornell Univ. v Bagnardi (68 NY2d 583 [1986]) and its subsequent decisions.
By letter dated July 2, 2007, the Church’s attorneys applied for a special permit. The Village immediately referred the application to the Village Planning Commission for review and recommendations to the Village Board pursuant to Zoning Ordinance § 152-70. At its next scheduled meeting on July 19, 2007, the Planning Commission, after receiving comments both in support of and in opposition to the application and reviewing relevant documentary materials, by a six to one vote, adopted a resolution recommending denial of the application.
The Village then scheduled a public hearing on the application for July 23, the date of the next meeting of the Village Board. At the public hearing, representatives of the Church and representatives of the Village’s CDC, as well as interested citizens, presented testimony and documentary evidence both for and against the application. The Village Board began deliberations on the question that evening, but, in view of the volume of materials and complexity of issues to be considered, decided to defer decision until its next regular meeting, which was scheduled for August 13, 2007.
On July 30, 2007, to accommodate the Church, the Village Board conducted a special meeting. At that meeting the Village *805 Board, by a unanimous seven to zero vote, adopted a resolution denying the Church’s application for a special permit to convert the Sherex property to religious use. In the text of the resolution, the Village Board makes the following findings, conclusions and determinations:
“1. Churches by their very nature serve the public welfare and are presumed to have a beneficial effect on the community.
“2. Development of the facilities of the Church somewhere in the Village would serve the public welfare.
“3. Churches are permitted use everywhere in the Village except in the Industrial Park.
“4. As more fully described in the Affidavit of Stanly J. Keysa, sworn to on May 22, 2007, the Industrial Park was developed at substantial public cost for the purpose of providing suitable sites for industrial use and thereby promoting the economic development and prosperity of the Village and its residents ... As testified to by Mr. Keysa, manufacturing brings outside wealth into a community and further enhances the prosperity of the community through the multiplier effect.
“5. The Village’s officially adopted plans and goals require use of the Industrial Park for industrial and related uses. See Zoning Ordinance § 152-26; Town of Lancaster, Village of Lancaster and Village of Depew, ‘Comprehensive Plan, A Common Future,’ pp. 36, 59, 61, 62, 177, 199, 207, 211, 301. The Comprehensive Plan was adopted by the Village by resolution of the Village Board on February 14, 2000.
“6. If the subject property is not converted to religious use, it will probably be sold to another industrial firm. Conversion of the property to religious use would deprive the Village of the benefit of continuing industrial use. To allow such conversion might also lead to conversion of other properties in the Industrial Park to religious or educational use.
“7. Weighing the beneficial effects of use of the subject property for religious purposes, as proposed by the Church, against the benefits of a continuing industrial use, the Board concludes that, on balance, it would be contrary to the public welfare to *806 approve the Church’s application for a special permit.”
On August 7, 2007, petitioners served an order to show cause and amended petition with supporting papers challenging the Village Board’s denial of the special use permit. On August 17, 2007, the court heard oral argument reserving decision. For the reasons recited below, the court denies petitioners’ application for a special use permit and upholds respondents’ determination.
The Law Governing This Special Proceeding
The law governing this special proceeding is recited in a series of Court of Appeals and Appellate Division decisions. (See Cornell Univ. v Bagnardi, 68 NY2d 583 [1986]; Trustees of Union Coll, in Town of Schenectady in State of N.Y.v Members of Schenectady City Council, 91 NY2d 161 [1997]; Matter of Pecoraro v Board of Appeals of Town of Hempstead, 2 NY3d 608 [2004]; Matter of Pine Knolls Alliance Church v Zoning Bd. of Appeals of Town of Moreau, 5 NY3d 407 [2005]; Albany Preparatory Charter School v City of Albany, 31 AD3d 870 [3d Dept 2006].)
1. Governing Legal Principles
In Cornell Univ. (at 583), the Court of Appeals addressed the balancing standards to be applied by courts in reviewing the request of an educational institution seeking to expand its operations into a municipally-zoned residential district.
In analysis relevant to the present proceeding, the Court of Appeals addressed the evolution and growth of educational and religious institutions into residential neighborhoods, noting:
“Historically, schools and churches have enjoyed special treatment with respect to residential zoning ordinances . . . Such favored status once seemed unobjectionable, since elementary schools and small churches serving the surrounding area were welcomed as benefits to the neighborhood. However, the advent of the automobile, as well as the growth and diversification of religious and educational institutions, brought a host of new problems. Sprawling universities brought increased traffic and other unexpected inconveniences to their neighbors . . . Thus, neighbors who may have formerly welcomed the construction of a new school began to view its arrival with distrust” (id. at 593).
In reviewing the standard of review governing exclusionary zoning of an educational institution or church, the Court of Appeals further stated:
*807 “Because of the inherently beneficial nature of churches and schools to the public, we held that the total exclusion of such institutions from a residential district serves no end that is reasonably related to the morals, health, welfare and safety of the community (Matter of Diocese of Rochester v Planning Bd., supra, at p 522). Since a municipality’s power to regulate land use is derived solely from its right to use its police powers to promote these goals, such total exclusion is beyond the scope of the localities’ zoning authority.
“These general rules, however, were interpreted by some courts to demand a full exemption from zoning rules for all educational and church uses. The result has been to render municipalities powerless in the face of a religious or educational institution’s proposed expansion, no matter how offensive, overpowering or unsafe to a residential neighborhood the use might be. Such an interpretation, however, is mandated neither by the case law of our State nor common sense.” (Id. at 594 [citations omitted].)
In addressing the governing balancing approach regarding judicial review of exclusionary zoning affecting educational institutions or schools, the Court of Appeals held (at 595):
“The controlling consideration in reviewing the request of a school or church for permission to expand into a residential area must always be the over-all impact on the public’s welfare. Although the special treatment afforded schools and churches stems from their presumed beneficial effect on the community, there are many instances in which a particular educational or religious use may actually detract from the public’s health, safety, welfare or morals. In those instances, the institution may be properly denied. There is simply no conclusive presumption that any religious or educational use automatically outweighs its ill effects. The presumed beneficial effect may be rebutted with evidence of a significant impact on traffic congestion, property values, municipal services and the like” (citations omitted).
In Trustees of Union Coll, in Town of Schenectady in State of N.Y. v Members of Schenectady City Council (at 161), the Court of Appeals addressed the issue whether a municipality acted lawfully in excluding educational institutions from a designated *808 historic district. Utilizing the balancing approach of the Cornell case, the Court of Appeals recognized that “municipalities can ‘enact land-use restrictions or controls to enhance the quality of life by preserving the character and desirable aesthetic features of a city.’ ” (Id. at 165 [citations omitted].) However, the Court reiterated that “a zoning ordinance will be struck down if it bears no substantial relation to the police power objective of promoting the public health, safety, morals or general welfare.” {Id. [citations omitted].)
In Trustees of Union Coll., the Court of Appeals further noted that “the public interest in historical preservation does not as a matter of law override competing educational interests, which by their very nature also are ‘clearly in furtherance of the public morals and general welfare.’ ” (Id. at 165-166 [citation omitted].) In reaching this determination, the Court of Appeals stated (at 166):
“The decision to restrict a proposed educational use can only be made after the intended use is evaluated against other legitimate interests, with primary consideration given to the over-all impact on the public welfare. A municipality’s pursuit of other legitimate objectives, such as historic preservation, does not diminish the importance of striking a balance between the important contribution made to society by educational institutions and the inimical consequences of their presence in residential neighborhoods. Thus, like traditional residential zoning ordinances, those designed to further an historic preservation purpose are not immune from the deliberative process that must precede the restriction of educational uses. Rather, proposed educational uses must be weighed against the interest in historical preservation, as well as other legitimate, competing interests, to determine how best to serve the public welfare.” (Emphasis added.)
In Matter of Pine Knolls Alliance Church v Zoning Bd. of Appeals of Town of Moreau (at 407), the Court of Appeals utilized the balancing approach of Cornell Univ. in holding that the Zoning Board of the Town of Moreau did not impermissibly interfere with the internal affairs of a church when it granted the church’s application for a special use permit to expand but denied its request to build an additional access road as part of the expansion. In reiterating the need to utilize the balancing approach of Cornell Univ., the Court of Appeals stated:
*809 “We have invalidated ordinances that impose blanket bans on religious or educational uses in particular communities in favor of a case-by-case review, endorsing the special use permit application process as the proper procedure for addressing expansion requests. This procedure ‘affords zoning boards an opportunity to weigh the proposed use in relation to neighboring land uses and to cushion any adverse effects by the imposition of conditions designed to mitigate them.’ . . .
“In assessing a special permit application, zoning officials are to review the effect of the proposed expansion on the public’s health, safety, welfare or morals, concerns grounded in the exercise of police power, ‘with primary consideration given to the over-all impact on the public welfare.’ Applications may not be denied based on considerations irrelevant to these concerns.” (Id. at 412-413 [citations omitted].)
In City of New York v Abundant Life Alliance Church of N.Y. (11 Misc 3d 1092[A], 2005 NY Slip Op 52295[U], *5 [Sup Ct, Queens County 2005]), in addressing the zoning dispute between a church and New York City concerning a church’s location in an urban renewal area, the court stated:
“Likewise, the plaintiffs’ attempt to distinguish those cases which require preferential treatment of religious uses of property from this matter on the basis that the property occupied by Abundant Life is located in an industrial as opposed to a residential area is unsupported by any appellate level authority and is unpersuasive.” (Emphasis added.)
In Albany Preparatory Charter School v City of Albany (31 AD3d 870 [3d Dept 2006]), the Court applied the balancing approach of Cornell and Trustees of Union Coll, to a zoning dispute involving the issuance of a special use permit for the use of property as a school in a commercially-zoned area. While sending the matter back to the trial court on procedural grounds, the Court emphasized the balancing approach of Cornell and Trustees of Union Coll, must be utilized in determining whether a special use permit governs such determination. However, in a concurring memorandum, Justice Spain noted:
“This line of cases has, until now, implicated the special treatment afforded to educational and religious institutions only with respect to residential *810 zoning and, even then, has consistently ‘rejected any argument . . . that “under no circumstances may [such uses] ever be excluded from designated areas.” ’ In my view, these precedents do not foreclose a finding that a zoning ordinance’s noninclusion of private educational uses in a particular zoned district may be a valid, proper exercise of the municipality’s police power. Unlike their expansion into residential areas which has long been held to be compatible with and in furtherance of the public good, locating schools in certain commercial, industrial, business, manufacturing, land conservation or other nonresidentially zoned districts may well be a justifiable, appropriate and legitimate municipal land use regulation which bears a substantial relation to the promotion of public health, safety and the like. ...
“Because the same reasoning does not necessarily and entirely apply in other zoning districts, I would not rule out the validity of a zoning ordinance’s non-inclusion of educational institutions in nonresidential districts. . . .
“I otherwise agree with the majority decision.” {Id. at 873 [citations omitted; emphasis added].)
In light of the foregoing, the court determines that respondents were compelled to utilize the balancing approach mandated by case law which requires a demonstrated showing that their determination to deny petitioners’ special use permit to construct a church in the Village Industrial Park bears a substantial relation to the public’s health, safety, welfare or morals with primary consideration being given to the overall project impact on the public welfare. (Pine Knolls Alliance Church at 413.)
Standard of Review
The standard of judicial review governing this special proceeding is recited in three Court of Appeals cases. (See Matter of Sasso v Osgood, 86 NY2d 374 [1995]; Matter of Pecoraro v Board of Appeals of Town of Hempstead, 2 NY3d 608 [2004]; Matter of Pine Knolls Alliance Church v Zoning Bd. of Appeals of Town of Moreau, 5 NY3d 407 [2005].)
Although the Village Zoning Ordinance assigns special permit decision-making authority to the Village Board {see Lancaster Village Code § 152-70), special permit decisions, even when *811 made by a legislative body, are considered administrative decisions for purposes of judicial review under CPLR article 78. (See Matter of Lemir Realty Corp. v Larkin, 11 NY2d 20 [1962].) Like variance determinations by zoning boards of appeals, special permit determinations by municipal legislative bodies are subject to judicial review only for rationality. (See id. at 24 [“(I)n reviewing board actions as to variances or special exceptions the courts do not make new or substitute judgments . . . The courts do not sit to supervise the discretionary acts of the hundreds of town boards and town zoning boards in this State”].) Although the courts have often referred to the substantial evidence standard in cases of this sort, the Court of Appeals explained in Matter of Sasso v Osgood (86 NY2d 374 [1995]) that such zoning determinations are “administrative or quasi-legislative in character and rationality is the appropriate standard of review,” and “the courts consider ‘substantial evidence’ only to determine whether the record contains sufficient evidence to support the rationality of the Board’s determination.” (Id. at 385 n 2.) As a practical matter, the grafting of substantial evidence language onto the arbitrary and capricious standard is unimportant, because as the Court of Appeals observed in Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County (34 NY2d 222, 231 [1974]), “Nationality is what is reviewed under both the substantial evidence rule and the arbitrary and capricious standard.”
In Pecoraro (at 613-614), the Court of Appeals in addressing the limited role of the courts and the standard of judicial review in determining zoning disputes recited:
“This Court has often noted that local zoning boards have broad discretion in considering applications for area variances and the judicial function in reviewing such decisions is a limited one. Courts may set aside a zoning board determination only where the record reveals that the board acted illegally or arbitrarily, or abused its discretion, or that it merely succumbed to generalized community pressure. A determination of a zoning board should be sustained on judicial review if it has a rational basis and is supported by substantial evidence. In Matter of Cowan v Kern, this Court stated the rationale for this rule:
“ ‘The crux of the matter is that the responsibility for making zoning decisions has been committed *812 primarily to quasi-legislative, quasi-administrative boards composed of representatives from the local community. Local officials, generally, possess the familiarity with local conditions necessary to make the often sensitive planning decisions which affect the development of their community. Absent arbitrariness, it is for locally selected and locally responsible officials to determine where the public interest in zoning lies’ (41 NY2d at 599).
“For this reason, a reviewing court should refrain from substituting its own for the reasoned judgment of the zoning board. Tt matters not whether, in close cases, a court would have, or should have, decided the matter differently. The judicial responsibility is to review zoning decisions but not, absent proof of arbitrary and unreasonable action, to make them’ (id.).
“We conclude that both Supreme Court and the Appellate Division improperly supplanted the reasoned decision of the Board in favor of their own judgments. Giving due deference to the broad discretion of the Board, we cannot conclude that the Board’s denial of the variance was either an abuse of discretion or irrational under the circumstances presented.”
While Pecoraro addressed the issue of judicial review of board determinations concerning grant or denial of an area variance, the principles of judicial review recited therein are applicable to this special proceeding.
In Pine Knolls Alliance Church (at 414-415), in reviewing a determination of a church’s application for a special use permit in connection with expansion plans, the Court of Appeals in addressing the standard of judicial review stated:
“This determination is supported by substantial evidence in the record, particularly the findings in the Levine traffic study and the Saratoga County Planning Board recommendation. Because there was nothing improper, irrational, arbitrary or capricious about the ZBA’s analysis or the conclusion it reached, the determination should not have been disturbed.”
With the foregoing principles in mind, this court now undertakes a review of the merits of this special proceeding.
*813 The Merits
On July 30, 2007, after balancing the presumed beneficial effects of petitioners’ proposed use of the Sherex property for religious use against the benefit of continuing industrial use, the Village Board determined that it was in the overall public interest to deny petitioners’ special use permit application.
The basis for the Board’s determination is reflected in its July 30, 2007 resolution which recites:
“1. Churches by their very nature serve the public welfare and are presumed to have a beneficial effect on the community.
“2. Development of the facilities of the Church somewhere in the Village would serve the public welfare.
“3. Churches are permitted use everywhere in the Village except in the Industrial Park.
“4. As more fully described in the Affidavit of Stan-l[e]y J. Keysa, sworn to on May 22, 2007, the Industrial Park was developed at substantial public cost for the purpose of providing suitable sites for industrial use and thereby promoting the economic development and prosperity of the Village and its residents ... As testified to by Mr. Keysa, manufacturing brings outside wealth into a community and further enhances the prosperity of the community through the multiplier effect.
“5. The Village’s officially adopted plans and goals require use of the Industrial Park for industrial and related uses. See Zoning Ordinance § 152-26; Town of Lancaster, Village of Lancaster and Village of Depew, ‘Comprehensive Plan, A Common Future,’ pp. 36, 59, 61, 62, 177, 199, 207, 211, 301. The Comprehensive Plan was adopted by the Village by resolution of the Village Board on February 14, 2000.
“6. If the subject property is not converted to religious use, it will probably be sold to another industrial firm. Conversion of the property to religious use would deprive the Village of the benefit of continuing industrial use. To allow such conversion might also lead to conversion of other properties in the Industrial Park to religious or educational use.
“7. Weighing the beneficial effects of use of the subject property for religious purposes, as proposed *814 by the Church, against the benefits of a continuing industrial use, the Board concludes that, on balance, it would be contrary to the public welfare to approve the Church’s application for a special permit.”
In denying petitioners’ application, the Village Board was adhering to a steadfast commitment to maintain the integrity of the Industrial Park. As stated in Mr. Keysa’s affidavit:
“To date, development in the M-IP District has been consistent with the intent expressed in Local Law No. 2-1981 [the zoning ordinance cited above]. That such intent has the support of the citizens of the community became clear in the late 1990’s, when the Town of Lancaster proposed to acquire an existing building within the Village Industrial Park for use by its Youth Bureau, Drug Abuse Counsel and Senior Citizens programs; this proposal was challenged by citizens’ petitions, a referendum held, and the proposition was overwhelmingly rejected, even though the alternatives were expected to be more expensive. A frequent comment was that ‘the industrial park should be kept for manufacturing. ’ ” (Affidavit of Stanley J. Keysa, point 15, at 4.)
In substance, respondents acknowledge no traditional ill effects from petitioners’ establishment of a church, such as traffic congestion and related nuisance effects. Instead, respondents advance three distinct arguments which they maintain constitute other legitimate interests which affect the overall impact on the public welfare, which include: (1) the creation of an industrial park to advance economic development through manufacturing and related industrial uses; (2) the utilization of public investment and development of the Industrial Park for industrial uses, including the overall economic development of the Village of Lancaster through job creation, property taxes and related economic activities; and (3) use of the Village Industrial Park consistent with the Comprehensive Plan as reflected in Village Code § 152-70.
Petitioners argue that respondents have failed to properly balance the presumed beneficial effect of establishment of a church against ill effects as reflected in the Village’s traditional police powers over matters concerning the public health, safety, welfare, and morals. Respondents reject petitioners’ restrictive reading of the term “public welfare.” Respondents emphasize the broad meaning of the term public welfare to include “other *815 legitimate considerations.” Respondents maintain the Village Board, in balancing petitioners’ presumed beneficial effect of utilizing the Sherex property for religious use, may utilize the demonstrated economic development considerations of an industrial park through manufacturing and related uses and zoning compliance with the Comprehensive Plan as primary considerations in assessing the overall impact upon the public welfare. The court now analyzes the merits of this argument.
Public Welfare Analysis
The substance of petitioners’ position is that the term “public welfare,” as used in the Cornell line of cases, does not carry a broad meaning which includes village board consideration of matters concerning economic development or compliance with a comprehensive zoning plan. In Cornell, the Court was concerned with exclusion of educational uses from residential zones. Therefore, the nature of the harm to the public welfare that could result were such things as traffic congestion and nuisance effects. The holding of Cornell (at 595), however, is that a court must consider “the over-all impact on the public welfare.”
In Cornell, the Court mentions traffic congestion and related nuisance factors as relevant considerations in the residential context; however, it did not establish a restrictive definition of public welfare to be applied in other contexts. (Cf. Berman v Parker, 348 US 26, 32-33 [1954] [“Public safety, public health, morality, peace and quiet, law and order — these are some of the more conspicuous examples of the traditional application of the police power to municipal affairs. Yet they merely illustrate the scope of the power and do not delimit it. . . . The concept of the public welfare is broad and inclusive”].)
Petitioners’ argument that the courts have restricted the concept of the public welfare to consideration of “traffic congestion, property values, municipal services and the like” (with a restrictive interpretation of “and the like”) is addressed by the Court of Appeals in Union College (supra) in which the Court was concerned with a proposed educational use in a residential historic district. In that case, the Court of Appeals recognized the need to evaluate the proposed use not just against the Cornell list of factors but also against the public interest in historic preservation (which it recognized as a legitimate interest) and, indeed, against other legitimate interests generally. The Court wrote:
“The decision to restrict a proposed educational use *816 can only be made after the intended use is evaluated against other legitimate interests, with primary consideration given to the over-all impact on the public welfare. A municipality’s pursuit of other legitimate objectives, such as historic preservation, does not diminish the importance of striking a balance between the important contribution made to society by educational institutions and the inimical consequences of their presence in residential neighborhoods. Thus, like traditional residential zoning ordinances, those designed to further an historic preservation purpose are not immune from the deliberative process that must precede the restriction of educational uses. Rather, proposed educational uses must be weighed against the interest in historical preservation, as well as other legitimate, competing interests, to determine how best to serve the public welfare.” (91 NY2d at 166 [emphasis added].)
Similarly, the Third Department in Albany Preparatory Charter School (at 871) held that the zoning board was entitled “to evaluate the proposed educational use against other legitimate interests which impact the public welfare” (emphasis added).
Economic Development Considerations
In the present case, respondents maintain the other legitimate interests which impact the public welfare are: (1) the creation of an industrial park to advance economic development through manufacturing and related industrial uses; (2) the utilization of public investment and development of the Industrial Park for industrial uses, including the overall economic development of the Village of Lancaster through job creation, property taxes and related economic activities; and (3) use of the Village Industrial Park consistent with the Comprehensive Plan as reflected in Village Code § 152-70.
New York cases which have considered the issue have noted that in zoning matters, municipality consideration of economic development concerns and compliance with a comprehensive plan is a legitimate exercise of public purpose over matters of land use.
In Courtesy Sandwich Shop v Port of N.Y. Auth. (12 NY2d 379, 389 [1963]), the Court of Appeals upheld condemnation of private property in connection with the creation of the World *817 Trade Center because it found that “facilitating the flow of commerce . . . is a public purpose . . .
In Asian Ams. for Equality v Koch (72 NY2d 121 [1988]), the Court of Appeals addressed distinctions between “traditional zoning” and “special district zoning” noting that special district zoning is based on the idea that zoning can be used as an incentive to further growth and development of a community rather than as a restraint. In relevant part, the Court of Appeals recites (at 128-130):
“Zoning, as first devised, was a means of dividing the whole territory of a municipality into districts and imposing restrictions on the uses permitted in them. Restrictions on size and density of construction to control fire and traffic hazards, for example, or to eliminate offensive uses from residential districts were deemed a reasonable exercise of the police power (see, Euclid v Ambler Co., 272 US 365). Such traditional zoning is both restrictive and passive, providing minimum encouragement for development of the municipality as a whole.
“Special district zoning — exemplified by the Manhattan Bridge District questioned here — represents a significant departure from this traditional Euclidian zoning concept. It is based on the idea that zoning can be used as an incentive to further growth and development of the community rather than as a restraint. It is one of several imaginative legislative schemes intended to encourage, or even coerce, private developers into making the City a more pleasant and efficient place to live and work. Incentive zoning is based on the premise that certain uneconomic uses and amenities will not be provided by private development without economic incentive. . . .
“New York City has used these special district incentive programs to develop uneconomic but necessary uses since 1961. . . . The districts created are not traditional zoning districts, narrowly limited to particular uses, but broad-based plans intended to preserve and .enhance troubled areas of the City which, because of their singular characteristics, are important to its wealth and vitality.”
In Asian Ams. for Equality (at 131), the Court of Appeals also addressed the issue of power of town zoning in accordance with a comprehensive plan. The Court states:
*818 “The power to zone is derived from the Legislature and must be exercised in the case of towns and villages in accord with a ‘comprehensive plan’ (see, Town Law § 263; Village Law § 7-704) or in the case of cities in accord with a ‘well considered plan.’ The requirement of a plan is based on the premise that ‘zoning is a means rather than an end.’ The function of land regulation is to implement a plan for the future development of the community (Berenson v Town of New Castle, 38 NY2d 102, 109, supra). Its exercise is constitutional only if the restrictions are necessary to protect the public health, safety or welfare. The requirement of a comprehensive or well-considered plan not only insures that local authorities act for the benefit of the community as a whole but protects individuals from arbitrary restrictions on the use of their land.
“A well-considered plan need not be contained in a single document; indeed, it need not be written at all. The court may satisfy itself that the municipality has a well-considered plan and that authorities are acting in the public interest to further it by examining all available and relevant evidence of the municipality’s land use policies (Udell v Haas, supra at 470-472). Zoning legislation is tested not by whether it defines a well-considered plan but by whether it accords with a well-considered plan for the development of the community.” (Citations omitted.)
In Kelo v New London (545 US 469, 480 [2005]), the United States Supreme Court in a condemnation proceeding, in addressing the question of whether a city’s emphasis on economic development within the context of a city development plan serves a public purpose, stated, “The disposition of this case therefore turns on the question whether the City’s development plan serves a ‘public purpose.’ Without exception, our cases have defined that concept broadly, reflecting our longstanding policy of deference to legislative judgments in this field.”
In addressing the merits of whether economic development should qualify as a public use, the Court in Kelo (at 484) stated:
“petitioners urge us to adopt a new bright-line rule that economic development does not qualify as a public use. Putting aside the unpersuasive suggestion that the City’s plan will provide only purely economic benefits, neither precedent nor logic supports petitioners’ proposal. Promoting economic *819 development is a traditional and long accepted function of government. There is, moreover, no principled way of distinguishing economic development from the other public purposes that we have recognized. ... It would be incongruous to hold that the City’s interest in the economic benefits to be derived from the development of the Fort Trumbull area has less of a public character than any of those other interests. Clearly, there is no basis for exempting economic development from our traditionally broad understanding of public purpose.”
The Comprehensive Plan
In relevant part, Village Code § 152-70, addressing special permits, recites:
“§ 152-70. Special Permits.
“A. General provisions.
“(1) The special uses for which conformance to additional standards is required shall be deemed to be permitted uses in their respective districts . . .
“(2) No permit or modification of the provisions of this code shall be authorized unless such special permit or modification:
“(a) Will be in harmony with the orderly development of the district, taking into account the location and size of the use, the nature and intensity of the operations involved in or conducted in connection with it . . .
“(d) Will not alter the essential character of the neighborhood nor be detrimental to the residents thereof. . .
“(f) Will be in accord with the comprehensive plan.”
The Village Board’s determination to reserve the property for continuing industrial use followed the recommendations of the Comprehensive Plan of the Villages of Lancaster and Depew and the Town of Lancaster and was adopted by the Village Board on February 14, 2000 and on November 1, 2000. The Comprehensive Plan, prepared by village consultants and adopted by the governing boards of the three municipalities, calls for the reservation for industrial use of uniquely suitable tracts of land along the railroad tracks running through those municipalities in order to maintain the economic vitality of the area. In relevant part, the Comprehensive Plan provides:
“Action 1.2.2 — The Village of Lancaster is currently *820 completing a grant application to acquire funds to develop an industrial access road into the industrial park. The Town of Lancaster and Village of Depew should support this application as the lands lie within the designated industrial area of the three communities: Large industrial parcels should be protected as development of these lands continues” (at 36).
“Action 2.3.1 — The three communities should continue their efforts to increase the number of businesses in the existing Lancaster Industrial Park. The Village is currently extending the access road further into the park to promote further development. New light industrial and office development should be directed toward this Park” (at 62).
“An analysis completed by the Erie County Department of Planning shows that approximately 40-45% of the County’s total vacant land is located in the Town and two Villages” (at 207).
In relevant part, section 5.4.1 of the Comprehensive Plan recites:
“5.4.1 Industrial Development . . .
“Walden Avenue bounded by Dick and Town Line Roads is currently an industrial-based corridor that is home to many of the most significant industries in the Lancaster/Depew region. Existing businesses include Aim Corrugated Box, American Sales Company, . . . and Lancaster Steel Services, to name just a few. This ‘critical mass’ of industries, in conjunction with strategic location and convenient transportation, can serve as a catalyst for future industrial development opportunities within the region. . . .
“This land area is home to several existing industries and has potential for future expansion.”
In this instance, respondents maintain that petitioners’ proposed religious use of the Sherex site is totally inconsistent with the Comprehensive Plan. (See affidavit of William G. Cans-dale, Mayor of Village of Lancaster, dated Aug. 13, 2007; affidavit of Stanley J. Keysa, sworn to on May 23, 2007, respondents’ verified answer.)
In Matter of Francis Dev. & Mgt. Co. v Town of Clarence (306 AD2d 880 [2003]), the Court upheld a determination of the Town of Clarence to deny petitioners’ application for a special *821 exception use permit to build a ministorage facility on land zoned major arterial. The Clarence Town Board denied the application based upon the finding of the town planning board that such a facility was not an allowed use in major arterial or commercial (zoning) districts and was inconsistent with the intent and vision of the master plan for this area. In upholding the determination, the Court stated (at 881): “Nevertheless, we agree with respondents that the mini-storage facility conflicts with the Town’s recently adopted Master Plan 2015 (Master Plan), and thus the Town Board properly denied the application for a special exception use permit . . . .”
The July 30, 2007 Village Board Resolution
In denying petitioners’ application for a special use permit, respondents issued a detailed resolution. (See verified answer, exhibit G.) In the text of the resolution, the Village Board makes the following findings, conclusions, and determinations:
“1. Churches by their very nature serve the public welfare and are presumed to have a beneficial effect on the community.
“2. Development of the facilities of the Church somewhere in the Village would serve the public welfare.
“3. Churches are permitted use everywhere in the Village except in the Industrial Park.
“4. As more fully described in the affidavit of Stan-l[e]y J. Keysa, sworn to on May 22, 2007, the Industrial Park was developed at substantial public cost for the purpose of providing suitable sites for industrial use and thereby promoting the economic development and prosperity of the Village and its residents ... As testified to by Mr. Keysa, manufacturing brings outside wealth into a community and further enhances the prosperity of the community through the multiplier effect.
“5. The Village’s officially adopted plans and goals require use of the Industrial Park for industrial and related uses. See Zoning Ordinance § 152-26; Town of Lancaster, Village of Lancaster and Village of Depew, ‘A Comprehensive Plan, A Common Future,’ pp. 36, 59, 61, 62, 177, 199, 207, 211, 301. The Comprehensive Plan was adopted by the Village by resolution of the Village Board on February 14, 2000.
*822 “6. If the subject property is not converted to religious use, it will probably be sold to another industrial firm. Conversion of the property to religious use would deprive the Village of the benefit of continuing industrial use. To allow such conversion might also lead to conversion of other properties in the Industrial Park to religious or educational use.
“7. Weighing the beneficial effects of use of the subject property for religious purposes, as proposed by the Church, against .the benefits of a continuing industrial use, the Board concludes that, on balance, it would be contrary to the public welfare to approve the Church’s application for a special permit.”
In reviewing the articulated rationale of the Village Board, it is evident that respondents acknowledge that petitioners’ application to build a church in the Industrial Park does not adversely affect the public’s health, safety, welfare or morals grounded in the exercise of traditional police powers, such as the adverse impact on traffic congestion, property values, municipal services and the like.
Instead, respondents maintain “other legitimate interests” which address the overall impact on the public welfare in denying petitioners’ special use permit include: (1) the creation of an industrial park to advance economic development through manufacturing and related industrial uses; (2) the utilization of public investment and development of the Industrial Park for industrial uses, including the overall economic development of the Village of Lancaster through job creation, property taxes and related economic activities; and (3) use of the Village Industrial Park consistent with the Comprehensive Plan as reflected in Village Code § 152-70.
Determination
Respondents impress upon the court that petitioners may construct a church in any residential, commercial or manufacturing district in the Village. (Village Code §§ 152-20, 152-21, 152-22, 152-23, 152-24, 152-25.) Respondents seek to impress upon the court that in light of the ability of petitioners to locate a church within any existing village residential, commercial or manufacturing district, the church zoning exclusion and use limitations contained within the Industrial Park are permissible under New York law.
*823 In reaching the determination recited herein, the court is mindful of the statement of the Court of Appeals in Diocese of Rochester (at 526): “That is not to say that appropriate restrictions may never be imposed with respect to a church and school and accessory uses, nor is it to say that under no circumstances may they ever be excluded from designated areas.” See also Albany Preparatory Charter School v City of Albany (at 873), the concurrence of Justice Spain:
“Unlike their expansion into residential areas which has long been held to be compatible with and in furtherance of the public good, locating schools in certain commercial, industrial, business, manufacturing, land conservation or other nonresidentially zoned districts may well be a justifiable, appropriate and legitimate municipal land use regulation which bears a substantial relation to the promotion of public health, safety and the like.”
In reaching the determination, the court is also mindful of the limited role of the courts in zoning matters. (Matter of Pecoraro v Board of Appeals of Town of Hempstead, 2 NY3d 608 [2004]; Matter of Pine Knolls Alliance Church v Zoning Bd. of Appeals of Town of Moreau, supra.) As noted in Pecoraro (at 613):
“Courts may set aside a zoning board determination only where the record reveals that the board acted illegally or arbitrarily, or abused its discretion ... A determination of a zoning board should be sustained on judicial review if it has a rational basis and is supported by substantial evidence ...
“ ‘Local officials, generally, possess the familiarity with local conditions necessary to make the often sensitive planning decisions which affect the development of their community. Absent arbitrariness, it is for locally selected and locally responsible officials to determine where the public interest in zoning lies.’
“For this reason, a reviewing court should refrain from substituting its own for the reasoned judgment of the zoning board. ‘It matters not whether, in close cases, a court would have, or should have, decided the matter differently. The judicial responsibility is to review zoning decisions but not, absent proof of arbitrary and unreasonable action, to make them’ ” (citation omitted).
*824 On the present record, the court determines that respondents have complied with the court’s direction of June 8, 2007 and reached a determination denying petitioners’ special use permit consistent with the balancing approach of Cornell, Union Coll. and the Pine Knolls Alliance Church line of cases. The court determines that existing New York law addressing the subject of balancing the presumed beneficial purpose of a church against the traditional municipal exercise of police powers as reflected in public health, safety, welfare and morals permits balancing “other legitimate considerations,” such as respondents demonstrated, economic development considerations in continued utilization of the Industrial Park for manufacturing and related uses and zoning compliance with a comprehensive plan as factors which effect the overall impact on the public welfare. (Trustees of Union Coll, at 166.)
On the present record, the court determines that, under New York law, respondents, Village, Village Board and Village CDC, in addressing the overall impact on the public welfare may balance the presumed beneficial effect of petitioners’ contemplated religious use of the Sherex site against “other legitimate interests” such as: (1) the creation of an industrial park to advance economic development through manufacturing and related industrial uses; (2) the utilization of public investment and development of the Industrial Park for industrial uses, including the overall economic development of the Village of Lancaster through job creation, property taxes and related economic activities; and (3) use of the Village Industrial Park consistent with the Comprehensive Plan as reflected in Village Code § 152-70. (See Matter of Pine Knolls Alliance Church v Zoning Bd. of Appeals of Town of Moreau, supra-, Asian Arns. for Equality v Koch, supra-, Matter of Diocese of Rochester v Planning Bd. of Town of Brighton, 1 NY2d 508 [1956]; Matter of Francis Dev. & Mgt. Co. v Town of Clarence, 306 AD2d 880 [2003].)
On the present record, the court determines that respondents, in denying petitioners’ application for a special use permit, engaged in the balancing approach mandated under New York case law. On the present record, the court further determines that respondents have demonstrated a substantial relationship exists between their determination to deny petitioners’ application for a special permit and the existence of other legitimate considerations limiting Industrial Park property usage solely for industrial and related use to advance village economic development prospects and compliance with the Comprehensive Plan.
*825 On the present record, this court determines there is substantial evidence to sustain respondents’ determination denying petitioners’ application for a special use permit. On the present record, the court holds that respondents’ determination to deny petitioners a special use permit to utilize the Sherex property located in the Village Industrial Park for religious use was not made in violation of lawful procedure, was not effected by an error of law, was not arbitrary and capricious, or an abuse of discretion.
Declaration and Relief
Petitioners move for partial summary judgment on their ninth cause of action seeking to invalidate the determination of the Village Board denying them a special use permit to utilize the Sherex property in the Village Industrial Park for religious use as arbitrary and capricious, defective in law, an abuse of discretion and not supported by substance evidence. (CPLR 7803 [3].)
Petitioners’ ninth cause of action substantially restates claims made in petitioners’ second and third cause of action. Although petitioners limit their claim for relief to the ninth cause of action, the court, in searching the record, determines it may address all claims made by petitioners in this special proceeding.
For the foregoing reasons, the court hereby issues the following declaration:
1. Village of Lancaster Code § 152-26 on its face and as applied is unconstitutional as applied to a church in the absence of respondents’ utilization of the balancing approach recited by the Court of Appeals in Cornell Univ. (supra); Trustees of Union Coll, (supra); and Pine Knolls Alliance Church (supra).
2. Consistent with this court’s decision of June 8, 2007, respondents have complied with the balancing approach under New York law, thereby relieving themselves the aforementioned constitutional infirmities in the enforcement of Village Code § 152-26.
3. Respondents’ declaration filed in the Office of the Erie County Clerk on September 1, 2000 remains in full force and effect and is valid.
4. Respondents’ determination to deny petitioners’ special use permit to construct a church in the Village of Lancaster Industrial Park is founded on substantial evidence and was not made in violation of lawful procedure, was not affected by an error of law, was not arbitrary and capricious, or an abuse of discretion.
*826 For the foregoing reasons, the court hereby grants the following relief:
5. Petitioners’ first, second and third causes of action are dismissed as a matter of law in light of the respondents’ actions in utilizing the balancing approach in denying petitioners a special use permit pursuant to Village Code § 152-70.
6. Petitioners’ fourth, fifth, sixth and seventh causes of action are hereby dismissed as a matter of law since the court determines the Declaration filed by the Village on September 1, 2000 with the Erie County Clerk, including the covenants, conditions and restrictions contained therein, are valid.
7. Petitioners’ eighth cause of action is hereby dismissed because the court upholds respondents’ determination.
8. Petitioners’ ninth cause of action is dismissed as a matter of law for the reasons recited in this memorandum decision.
Accordingly, the amended petition and verified complaint is dismissed as a matter of law.